

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00062-CR

DANIEL EUGENE ANDERSON                                    APPELLANT

V.

THE STATE OF TEXAS                                            STATE

----------

## FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1331169D

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Daniel Eugene Anderson of murdering a twelve-year-old and assessed his punishment at 99 years' confinement and a $5,000 fine. The trial court sentenced him accordingly. In three issues, Appellant contends that the evidence was insufficient to support his conviction, that the statute allowing a criminal trial to proceed with less than twelve jurors is

---

[1]*See* Tex. R. App. P. 47.4.

unconstitutional, that the governing constitutional provision is internally conflicting, and that the trial court violated his right to cross-examine and confront adverse witnesses. Because we hold that the evidence was sufficient to support the jury's verdict, that allowing the jury to proceed with eleven jurors did not violate Appellant's constitutional rights, and that Appellant did not preserve his confrontation complaints, we affirm the trial court's judgment.

**Brief Facts**

The evidence showed that on the evening of June 1, 2013, Appellant and three other black males drove to the home of D.T., otherwise known as Mainey, shot up his home, shot him in the leg, and shot his twelve-year-old cousin J.H. multiple times with an assault rifle; J.H. died on June 3, 2013. A jury convicted Appellant of his murder.

**Sufficiency of the Evidence**

The indictment charged that Appellant "intentionally or knowingly cause[d]" J.H.'s death "by shooting him with a deadly weapon, to wit: a firearm," or, alternatively, that "with the intent to cause serious bodily injury to [J.H., Appellant] commit[ted] an act clearly dangerous to human life, namely, shooting him with a deadly weapon, to wit: a firearm, which caused his death."[2] The jury charge included an instruction on the law of parties.[3] In his first issue, Appellant

---

[2]*See* Tex. Penal Code Ann. § 19.02(b)(1), (2) (West 2011).

[3]*See id.* § 7.02.

contends that the evidence was insufficient to show intent, to show that he was one of the shooters, and to show that he was the one who fired the fatal shots and that it was also insufficient to place him at the scene of the crime.

In our due process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[4]

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[5]

The trier of fact is the sole judge of the weight and credibility of the evidence.[6] Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.[7] Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence

---

[4]*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

[5]*Id.*; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015).

[6]*See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

[7]*See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

3

when viewed in the light most favorable to the verdict.[8]  We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution.[9]  Specifically, in determining the sufficiency of the evidence to show Appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution."[10]

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt.[11]

A person is criminally responsible for another's conduct when "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."[12]

The shooting occurred around June 1, 2013, near midnight, in east Fort Worth on Eastover Street.  Robert Earl Harris lived two or three houses down

---

[8] *Murray*, 457 S.W.3d at 448.

[9] *Id.* at 448–49.

[10] *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

[11] *Dobbs*, 434 S.W.3d at 170; *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

[12] *See* Tex. Penal Code Ann. § 7.02(a)(2).

4

from the scene of the shooting. He testified that he heard and saw what happened from the vantage point of his front porch. It was dark, there were no streetlights, and a big peach tree blocked much of his view, but he heard shots from two different weapons and saw the muzzle flashes of shots fired from the back seat of a black, four-door car sitting in front of the targeted house. He told the jury that one of the guns was firing "rapidly," "like a machine gun," and that "you could hear shells hitting the street." That gun made a louder sound when it fired than the other gun. Harris later clarified that it sounded like several casings hitting the street. He testified that he did not see or hear any return fire. After the shooting, the car sped off. Harris stated that he heard the grandmother of the targeted home holler, "Oh, my baby got hit[!]" Harris went to the scene and saw a boy lying in the middle of the driveway. He had been shot in the head. Another boy was also lying in the street, shot.

Officer Kyle Davis of the Fort Worth Police Department (FWPD) testified that he and his partner responded to the call about the shooting. They arrived soon after the first officer to respond. Davis saw "one male shot in the street, another male shot in the driveway[,] and [a lot of what looked like rifle] . . . casings all over the street." Davis noted that "the house had been shot up[,] . . . a lot of people [were] running everywhere, [and t]here[ wa]s a lot of chaos." The two injured males were both minors; the one in the street, D.T., was sixteen years old, and the one in the driveway, J.H., was twelve years old. J.H. had been "shot multiple times all over his body," including "two or three to the face."

5

D.T. had been shot in the leg but was conscious and awake. The police found a bag of .22 bullets and some marijuana in his pocket, but no gun. Davis testified that he had met D.T. about a month before after a different drive-by shooting nearby in which D.T. had also been shot.

Davis spoke to a nine-year-old boy close to the driveway of the house. Davis believed that he was J.H.'s little brother. Davis testified that the little boy "seemed like he was in shock," was excited, and was telling anyone who would listen what he had seen. Davis reported that the little boy had said that he had seen "a black Crown Vic [that] looked like a police car," that "three black males got out of [it]," that one was "heavyset," that the heavyset one "shot multiple rounds at both people that were shot," and that he "then left northbound." The little boy also said that one of the three males had a rifle.

C.J., who was ten years old at the time of trial, testified after Davis. C.J. testified that he was present when his brother J.H. was shot and that J.H. had later died after C.J.'s tenth birthday. C.J. additionally testified that D.T. was his cousin. According to C.J., his grandmother, mother, six siblings, and D.T. had all lived in the house on Eastover. C.J. testified that on the night of the shooting, his grandmother had told him to go get J.H., who was down in the driveway. It was dark, but the porch light was on. C.J. stood on some little stairs outside the front door and told J.H. that his grandmother had said to get in the house. J.H. said, "[A]ll right," and was walking up. Then a "blueish, dark blue" car drove up, and it stopped by the tree in front of the house. C.J. could see four black men shooting

6

from outside the car, and he saw a long gun and a "kind of short" gun. C.J. clarified on cross-examination that all four men got out of the car, that all four were shooting, and that three of them shot long guns. C.J. ran in the house after J.H. was already on the ground. C.J. testified that D.T. was inside the house during the shooting, but everyone went outside after the shooting stopped. C.J. never saw D.T. leave the house. C.J. testified that he remembered telling the police that the car was black but that the car was actually blue. C.J. also remembered seeing the car down the street when he first went outside. C.J. did not recognize any of the four shooters.

Tyler Glapa, a crime scene officer for the FWPD, testified that he was at the scene about ten and a half hours. He collected twenty-six fired casings. Twenty one were apparent rifle casings, and five were pistol casings. He also located and documented thirty different holes or impacts to the house. Officer Christopher Bain, another FWPD crime scene officer, testified that he discovered four holes in the back of the house and that at least four bullets went through the house, front to back.

In the early morning hours of June 2, 2013, after the shooting, Bain went to JPS Hospital to photograph D.T. Bain also recognized D.T. from the drive-by shooting that had happened about a month earlier. Bain then went to Harris Hospital to see J.H., who had several bandages covering various gunshot wounds, a breathing tube, and blood pouring from a gunshot wound in his right

7

buttock area. Early on June 3, 2013, the police received the report of J.H.'s death from the hospital.

Susan Roe, a deputy medical examiner with the Tarrant County Medical Examiner's Office, testified that she performed J.H.'s autopsy on June 4, 2013. She testified that before the shooting, J.H. had been a healthy twelve-year-old. He had been five feet, six inches tall and had weighed 163.6 pounds. Roe determined that six bullets had entered J.H.'s body. She also determined that the cause of death was multiple gunshot wounds, that his injuries were consistent with those of a high-velocity rifle, that his brain and facial injuries "were not survivable," and that he would have died at the scene absent medical intervention. She identified eight projectiles and bullet fragments recovered from the body.

Lillian Lau, a senior forensic scientist at the FWPD Crime Lab, testified that she had determined that three of those projectiles and fragments, caliber 7.62 or .30, had been fired from the same weapon as several of the fragments and projectiles recovered from the crime scene at Eastover. She also determined that twenty-one fired casings found at the scene, caliber 7.62 or .30, were all fired from the same unknown firearm, an AK type or SKS type or a variant of those rifles, and that five .40 Smith and Wesson caliber casings were fired from either a Glock or a Smith and Wesson Sigma series pistol.

Courtney Miles, whom some knew as Tran, testified that he had known Appellant about two years. Appellant, whom Courtney knew as Little Man and

8

whom some other people called Hawk, had sometimes worked for Courtney in landscaping. On June 1, 2013, around 5:00 or 6:00 p.m., Appellant spoke with Courtney by phone and asked if he could borrow an SKS rifle from Courtney's home because someone "with a ponytail or something" had robbed him. Appellant was upset. Courtney called his girlfriend, who was at his house, to tell her that Appellant was coming by. Courtney's girlfriend called Courtney back to tell him that Appellant had been there and had taken the gun.

Courtney, who had second thoughts about loaning out his assault rifle, picked up a friend, Will Gary, who was known in the neighborhood as Unc, and then drove straight to the house of Charles Williams, whom he knew only as Chubs. Courtney believed that he could find Appellant with Chubs because they were "like play brothers." Courtney saw Appellant, Appellant's cousin, and two other men he did not recognize at Chubs's home. Appellant was in a black 626 Mazda four-door car. The other men were in a Kia Spectra Jeep. Appellant wore all black clothing, had the SKS, "was messing with [its] clip," and was putting on gloves. The others, dressed all in black, were also "[p]utting on [blue] gloves, getting ready. . . . [T]hey [all] had guns and things in the[ir] hands and stuff." Specifically, Courtney testified that Appellant's cousin and the other two men had handguns. Courtney and Will tried to talk Appellant out of doing anything and tried to retrieve Courtney's gun. Appellant would not listen. Appellant was so angry, according to Courtney, that he frightened Courtney, who left with Will. Courtney and Will drove to Courtney's mother's home, which was

9

in the same neighborhood as Eastover, about four streets away. One or two hours later, they heard more than thirty gunshots.

The next day, at Will's house in the same neighborhood as the shooting, Appellant told Courtney and Will "that he didn't mean to shoot the kid. He was after the ponytail guy that robbed him." Courtney testified that Appellant had told him that he had thrown the rifle in the "bottom," an area in the Como neighborhood.

Belva Artis, who had been Courtney's girlfriend on June 1, 2013, testified that Appellant came to Courtney's house but that she did not remember anything he said or did as he left the house, whether she saw him when he walked out, whether he took a gun out with him, whether he appeared to be concealing anything, what sort of car he was in, or whether he was alone or had someone with him in the car. In her interview with the police on June 18, 2013, however, she had stated that Appellant had arrived at Courtney's home in a black car and that she had seen Appellant leave with the gun.

Will testified that he and Courtney lived in the same neighborhood and worked together. He testified that about 7:00 p.m. on June 1, 2013, Courtney called and picked him up. They went to Chubs's house. Chubs also lived in the neighborhood. A foreign, black, four-door sedan was parked on the street; Appellant was in the driveway. Maybe three other adult males besides Chubs were there. One of them was a really "[b]ig guy." Will testified that three young black males drove up in a small dark or blue SUV while he and Courtney were

10

talking to Appellant. Will recognized one of the three from a birthday party of Appellant's. The three men got out of the SUV with gloves and guns. Will believed that he saw two black semi-automatic handguns. He also saw Courtney's assault rifle in the black sedan, first in the trunk and later in Appellant's hands when Appellant was in the front seat of the black car.

Appellant talked to Will about standing up for oneself when "somebody do[es] something to you." Appellant said, "I can't let him get away with that." Appellant was talking about "[a] youngster with a ponytail" who had tried to rob him earlier that day outside a convenience store off Highway 287. Will testified that he and Courtney had tried to defuse the situation, but Will was unsure whether Appellant had been receptive to their efforts.

Will testified that he saw Appellant and the three black males who had arrived in the SUV get in the black sedan as he and Courtney drove away. Appellant drove the black sedan. Will believed that the four men had the firearms with them. Will testified that he did not "remember outfits" but that the four men wore "regular clothes," black or blue shirts and blue jeans, "not exactly dark clothes."

Will told the jury that he and Courtney went to Courtney's mother's house and that an hour or two later, "[a]bout 10:30, something like that," when they were outside, they heard about twenty gunshots "close enough for [them] to duck" behind the car.

11

Will testified that Courtney and he were visiting outside his house the next afternoon, and Appellant drove over in his car, a Caprice station wagon. They spoke of the shooting. Appellant told him that "they hated . . . that the little boy had got shot" and that "that wasn't the person they w[ere] trying to get to."

Chastain Ross testified that he had been friends with Chubs and Appellant about eighteen years. Chastain testified that Appellant owned two different cars, a station wagon and a Chevy Caprice. Chastain testified that on June 1, 2013, during the day, he and Chubs were at Chubs's house when Appellant arrived. Chastain testified that Appellant had told him that a sixteen- or seventeen-year-old male with light skin and long hair had "flashed a gun at him." Chastain said that Appellant had stated that he did not like that and that "he was going to get him."

Chastain testified that Appellant left but returned that night in a small, black, four-door car that had no hubcaps and no front license plate. Chastain had not seen the car before and did not know where it came from. He did not know if Appellant had driven the car or if anyone had come to Chubs's house with him. About five minutes after Appellant arrived, a dark blue Jeep Cherokee drove up across the street, and three black men got out. Chastain had not seen the Jeep or the men before. Appellant told Chastain that they were "[h]is kinfolks." The men were wearing casual shorts and shirts. Chastain said that Appellant walked into Chubs's house, carried two semiautomatic handguns back outside, and gave them to two of the three other men. Appellant carried an

12

assault rifle, and Chastain said that Appellant had been "cocking it" and "checking to see if you could cock it back." Chastain testified that Unc (Will) and Tran (Courtney) were also at Chubs's house and that they had arrived in a Nissan SUV.

Chastain testified that Appellant and the three men from the Jeep were getting in the black car when he went to the bathroom. Chastain did not see who the driver was. When he went back outside, the black car had left, and so had the Nissan SUV. The Jeep was still parked across the street. About five to ten minutes later, Chastain heard "[a] few shots."

About five minutes after the gunshots, Chastain testified, Appellant came back to Chubs's house; he was sitting in the front passenger seat of the black car. Chastain said that Appellant handed him the two handguns and told him to take them inside to Chubs and to tell him to put them up. Chastain did as instructed but did not see what Chubs did with the guns. When Chastain went back outside, the Jeep, the black car, and the four men were gone. Appellant returned by himself about fifteen to twenty minutes later. Chastain said that Appellant told him that "he felt bad for the little dude in the driveway." Chastain said that Appellant also told him that they had circled the block first and then come around to the house again. Then Appellant said, "I hopped out and let the motherfucker go," at the same time as he moved his hands like he was holding and shooting an assault rifle. Chastain said that Appellant warned him that he

13

could not "say nothing to nobody, not even [his] hamburgers," joking because Chastain was a big man.

Cardae Davis testified that he had known Appellant four or five years and that he also knew Mainey, a light-skinned, thin, taller male with long hair. Davis testified that State's Exhibit 111, the photo Bain took of D.T. within hours of the shooting, was Mainey. According to Davis, D.T. was a troublemaker. Davis testified that on June 1, 2013, Appellant called him and asked for some guns because D.T. and his cousins had pulled a gun on Appellant a few hours earlier. Davis later clarified that the other two people with D.T. had been his brother and his cousin.

On June 2, 2013, Appellant called Davis, and at around noon, Appellant and Davis met at a small, local shopping center. Appellant was in a blue station wagon, and Davis got in the car with him. Davis testified that Appellant told him that his cousin and brother had been at the shooting, that Chubs was the driver, and that "he felt bad for the little boy who got shot." Davis told the jury that Appellant had said that in the dark, he had thought that the boy was "one of them," part of D.T.'s "entourage," because the twelve-year-old was big and looked older than his age.

Detective Thomas O'Brien of the FWPD testified that within hours of the shooting, C.J. had described the gunmen's vehicle as "a black vehicle with black tint, black wheels, and . . . some sort of red tape . . . on the back right light" and had said that he believed there were two shooters at the scene. In C.J.'s later

14

interview, conducted on June 6, 2013, by a forensic interviewer at Alliance for Children, the details changed. The car now had "a push bumper on the front," and now C.J. said that there had been three shooters.

O'Brien also interviewed Appellant and testified about that interview, which was played for the jury. Appellant denied being involved in the shooting or present at the scene of the shooting. Appellant stated in the interview that a sixteen- or seventeen-year-old "bright kid with a ponytail" had pulled a pistol on him near a neighborhood convenience store and that it had made him mad. O'Brien took bright to mean "light" and testified that the description fit D.T. O'Brien had already heard that story from Chastain, Chubs, and Courtney. O'Brien also told the jury that Appellant had said "that he knew that there was a 12-year-old boy who was shot, who was killed. He knew that the other individual was shot in the leg. He said he knew it was a black car, and he knew that they had pulled up and started shooting." Appellant stated in the interview that he got the information from the neighborhood or police fliers and that he did not watch the news too much. The detective admitted that those facts were pretty common knowledge within the community on the east side.

But O'Brien also testified that he seized Appellant's cell phone pursuant to a warrant and that the phone in State's Exhibit 140 was that cell phone. He further testified that the cell phone showed that someone had researched Fort Worth shootings on June 2, 2013 and that at almost 1:00 p.m. that day, someone had researched how to take a Glock apart. O'Brien said that all five .40 caliber

casings found at the crime scene had been shot from a Glock and that you take Glocks apart differently than normal handguns. O'Brien also testified that in his experience, individuals who commit homicides usually try "to take [the gun] apart so they can get rid of it at different locations."

O'Brien testified that he interviewed Courtney on June 18, 2013, and that Courtney told him that the SKS rifle used in the shooting was his and that he had given Appellant permission to use it. O'Brien also testified that when he interviewed Belva Artis, her memory was fine "later in the interview." O'Brien further took a statement from Will.

The evidence, viewed in the light most favorable to the verdict, showed that Appellant wanted to "get" D.T.; that Appellant and three companions obtained weapons, including at least one assault rifle and handguns; that they drove a dark car; that they left Chubs's home in the same neighborhood as the shooting about five or ten minutes before the shooting and returned about five minutes later; that D.T.'s home and J.H. were both hit with multiple rounds from an assault rifle, that Appellant was seen carrying and loading an assault rifle; and that Appellant had admitted that he or a member of his group had shot J.H., who died two days later. Based on the applicable standard of review, we hold that this evidence is sufficient to support Appellant's murder conviction as a principal or as a party under the law of parties,[13] and we overrule his first issue.

---

[13]*See* Tex. Penal Code Ann §§ 7.02, 19.02(b)(1), (2); *see also Washington v. State*, No. 02-13-00050-CR, 2015 WL 601857, at *7 (Tex. App.—Fort Worth

**Disabled Juror**

During the trial, one of the twelve jurors became disabled, and the trial court decided to finish the trial with eleven jurors. Appellant did not challenge the disability finding but objected that article 36.29 of the code of criminal procedure is unconstitutional because article V, section 13 of the Texas Constitution entitles him to a jury of twelve people,[14] and he re-asserts that argument here. But Appellant acknowledges that article V, section 13 of the constitution also provides "for the legislature . . . to authorize verdicts by less than twelve" and "says that less than 12 jurors can hear a case if one or more jurors become ill or dies." The Texas Court of Criminal Appeals has already held the challenged provisions of the statute constitutional.[15]

Appellant also contends, though, that article V, section 13 contradicts or may contradict itself. The section provides,

> Grand and petit juries in the District Courts shall be composed of twelve persons . . . . When, pending the trial of any case, one or more jurors not exceeding three, may die, or be disabled from sitting, the remainder of the jury shall have the power to render the verdict;

Feb. 12, 2015, no pet.) (mem. op., not designated for publication) (concluding Washington was guilty of capital murder as a party when cohort intentionally killed the complainant); *Borja v. State*, No. 05-02-13278-CR, 2003 WL 22017226, at *3, *5 (Tex. App.—Dallas Aug. 27, 2003, pet. ref'd) (mem. op., not designated for publication) (holding evidence was sufficient to support Borja's guilt as principal so absence of instruction on law of parties was harmless).

[14]*See* Tex. Const. art. V, § 13; Tex. Code Crim. Proc. Ann. art. 36.29(a) (West Supp. 2016).

[15]*See Maciel v. State*, 517 S.W.2d 789, 790 (Tex. Crim. App. 1975).

17

provided, that the Legislature may change or modify the rule authorizing less than the whole number of the jury to render a verdict.[16]

Appellant mistakenly prioritizes the beginning of the section. As the Texas Court of Criminal Appeals has explained,

> It is well established that the Constitution must be read as a whole, so as to give effect to each and every provision. No part of the Constitution should be given a construction which is repugnant to express authority contained in another part, if it is possible to harmonize the provisions by any reasonable construction.[17]

Additionally, provisions "which relate to the same subject matter should be construed together and considered in light of each other," and further, "in construing apparently conflicting provisions of the same constitution, the more general provision must yield to the more specific provision."[18] Thus, the general rule of twelve persons per jury must yield to the disabled juror exception.[19] We overrule Appellant's second issue.

---

[16]Tex. Const. art. V, § 13.

[17]*Oakley v. State*, 830 S.W.2d 107, 110 (Tex. Crim. App. 1992) (citations omitted).

[18]*Clapp v. State*, 639 S.W.2d 949, 951–52 (Tex. Crim. App. 1982), *overruled on other grounds by Comer v. State*, 754 S.W.2d 656, 659 (Tex. Crim. App. 1986), *overruled by Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997).

[19]*See Maciel*, 517 S.W.2d at 790.

**Confrontation and Cross-Examination**

At the end of the discussion of his second issue in his brief but before the

subheading introducing his third issue, Appellant writes,

> An expert witness was allowed to testify as to gang affiliation, etc. This adverse witness was not timely disclosed to the defense in enough time for Defendant to prepare to question this witness. Therefore, the evidence presented by this witness violated Defendant's 6th Amendment right to cross examination and confrontation of adverse witnesses, his rights to effective assistance of counsel, his rights under Article 39.14 of the Texas Code of Criminal Procedure, and of the his [sic] right to a fair trial under both the Texas and United States Constitutions.

To the extent that Appellant intended that portion of his brief to be a complaint on

appeal, it is forfeited because of inadequate briefing.[20]

In his third issue, Appellant contends that his right to cross-examine and

confront two adverse witnesses was violated, but his discussion applies that

complaint to four witnesses: C.J., who testified and was cross-examined; the

adult who took C.J. to the police station (which evidence showed was his

mother); Detective Matt Baron, who took a statement from C.J.; and the Alliance

For Children forensic examiner who videotaped one of C.J.'s statements.

To preserve a complaint for our review, a party must have presented to the

trial court a timely request, objection, or motion that states the specific grounds

---

[20]*See* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (citing cases), *cert. denied*, 132 S. Ct. 2712 (2012); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App.) (stating that the court "has no obligation to construct and compose appellant's issues, facts, and arguments 'with appropriate citations to authorities and to the record'"), *cert. denied*, 555 U.S. 1050 (2008).

for the desired ruling if they are not apparent from the context of the request, objection, or motion.[21]  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule.[22]  A reviewing court should not address the merits of an issue that has not been preserved for appeal.[23]

Appellant does not direct us to any place in the record where he raised an objection regarding his inability to cross-examine or confront C.J.'s mother, Baron, or the forensic examiner in the trial court, nor have we located such objection in our review of the record.  He also stated, "Yes, Your Honor," when the trial court asked if C.J. could be finally excused after his live testimony and did not raise any objection regarding an inability to further cross-examine or to confront C.J. or ask the trial court to recall C.J. after O'Brien's testimony.  Those complaints are therefore forfeited.

Within this issue Appellant also complains of the harmful admission of hearsay evidence over his objection.  He points to the following passage:

> Q.    And why did you review [C.J.'s] statement?
>
> A.    I wanted to know what he said.

---

[21]Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016); *Sanchez v. State*, 418 S.W.3d 302, 306 (Tex. App.—Fort Worth 2013, pet. ref'd).

[22]Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013).

[23]*Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

> Q. During his interview with Detective Barron, did he describe the car that he saw in the front yard or in the street outside the front yard?
>
> A. Yes.
>
> Q. What description did he give for the vehicle?
>
> [Defense counsel]: Objection; hearsay.
>
> THE COURT: Just a moment.
>
> Overruled.

Yet after that passage, O'Brien testified about the description C.J. gave of the car with no further objection:

> Q. [By the State] . . . . What description did [C.J.] give for the vehicle?
>
> A. It was a few different descriptions as he was trying to explain to the detective what he saw. The initial description was a black vehicle with black tint, black wheels and appeared to have tape—some sort of red tape—tape on the back right light.
>
> Q. And how soon after this offense did Detective Barron speak to [C.J.]?
>
> A. It would have been within hours.
>
> Q. And at that time he said a black vehicle?
>
> A. Yes.
>
> Q. With no tint or with tint?
>
> A. With tint.

Appellant similarly objected to O'Brien testifying as to how many shooters C.J. reported seeing, the trial court overruled the objection, and then testimony was admitted through further questioning without objection.

21

Absent a running objection or ruling outside the jury's presence, a party must continue to object each time the objectionable evidence is offered to preserve error.[24] A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling.[25] This rule applies whether the other evidence was introduced by the defendant or the State.[26]

Because Appellant did not obtain a ruling outside the jury's presence or make and secure a ruling on a running objection, he was required to object to all the testimony regarding C.J.'s descriptions of the car and the shooter. Appellant did not do so. He therefore forfeited his complaints about O'Brien's testimony regarding C.J.'s descriptions of the car and shooters. Appellant does not direct our attention to any other overruled hearsay objections in the record. Accordingly, we overrule his third issue.

**Conclusion**

Having overruled Appellant's three issues, we affirm the trial court's judgment.

---

[24]*Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)).

[25]*Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (citing *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)), *cert. denied*, 562 U.S. 1142 (2011); *Lane v State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004).

[26]*Leday*, 983 S.W.2d at 718.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and SUDDERTH, JJ.

SUDDERTH, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 22, 2016